UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

**Express Scripts, Inc., and**
**Express Scripts Senior Care Holdings, Inc.**,

    Plaintiffs,

    v.

**kaléo, Inc.**,

    Defendant.

Case No.

**Jury Trial Demanded**

## Complaint

Plaintiffs Express Scripts, Inc., and Express Scripts Senior Care Holdings, Inc. (together, for purposes of this Complaint, "**Express Scripts**") bring this Complaint against kaléo, Inc. ("**kaléo**"), and allege the following:

### Nature of the Action

1. Express Scripts brings this action to stop kaléo from wrongfully profiting from its price gouging and its ongoing violations of contractual obligations to pay rebates and administrative fees to Express Scripts. kaléo is the latest in a line of pharmaceutical companies that has raised the price of a life-saving drug by excessive amounts in order to exploit for profit those who depend upon the medication.

1

2. As widely reported,[1] kaléo has rapidly and dramatically raised the list price for its combination drug-device, Evzio, by over 500%, from $575 for a two-pack of injectors in 2014 to a staggering $3750 as of 2016.

3. Evzio is an auto-injector that delivers a single dose of naloxone, a life-saving drug that, if timely administered, can reverse the effects of an opioid overdose. The therapeutic benefits of naloxone have been known for decades. The drug was patented in 1961 and was approved by the FDA for the treatment of opioid overdoses in 1971.

4. Evzio is one of two naloxone devices approved by the FDA that can be administered by persons with little to no medical training in an emergency. The other is Narcan, a nasal spray containing naloxone. Before FDA's approval of Evzio and Narcan in 2014 and 2015, respectively, naloxone was available in pre-filled syringes. In contrast to the shockingly high price of Evzio, Narcan costs roughly $150 for a pack of two single-use devices. Pre-filled naloxone syringes are also available and cost approximately $14–$21 per dose.

5. kaléo's decision to dramatically hike the price of Evzio in the midst of a nationwide opioid epidemic alarmed many throughout the country, including 31 U.S. Senators, who, on February 8, 2017, sent a letter to kaléo requesting an explanation for why it was "ratcheting up the price for Evzio." As the Senators put it:

> We are deeply concerned about reports that Kaléo dramatically increased the cost of its naloxone injector device, Evzio, an FDA approved medication used for the emergency treatment of an

---

[1] *E.g.*, Shefali Luthra, *Price of Opioid-Overdose Antidote Skyrockets*, KAISER HEALTH NEWS, republished in SCIENTIFIC AMERICAN (Feb. 6, 2017), https://goo.gl/XWF4nn; Ravi Gupta, Nilay D. Shah & Joseph S. Ross, *The Rising Price of Naloxone—Risks to Efforts to Stem Overdose Deaths*, 375 NEW ENGLAND JOURNAL OF MEDICINE 2213 (Dec. 8, 2016), https://goo.gl/1tp3KO.

For ease of reference, we have shortened all website links with Google's URL shortener, http://goo.gl.

opioid overdose . . . . This drug is now in the hands of first responders and families struggling with substance use disorder across the country. It is particularly needed in rural areas where access to life-saving emergency services can be limited. Such a steep rise in the cost of this drug threatens to price-out families and communities that depend on naloxone to save lives.

Addiction to heroin has reached epidemic levels. More than 30,000 Americans are estimated to die each year due to opioid overdoses. Through increased access to community education, treatment and recovery programs, so many of these deaths could be preventable. Naloxone products are an important part of any community's response to our nation's opioid crisis, and demand for naloxone products has increased significantly in recent years. Evzio was designed to be simple to administer, making it particularly well suited for use by laypersons such as families looking to protect loved ones from overdose. Unfortunately, reports indicate Kaléo has responded to the increased need for naloxone devices by ratcheting up the price for Evzio.

At a time when Congress has worked to expand access to naloxone products and to assist state and local communities to equip first responders with this life-saving drug, this startling price hike is very concerning.[2]

6. This lawsuit is necessary to prevent kaléo from profiteering at the expense of Express Scripts, its client health plans, and the members of those plans to whom Evzio is administered or dispensed. As a pharmacy benefit manager, Express Scripts works to make the price of prescription medications affordable and to shield its clients and their members from unexpected price shocks. Express Scripts holds contracts with kaléo that specifically entitle it to rebates from kaléo ███████████████████████████████████████. Express Scripts, in turn, then shares those rebates with its clients, in accordance with the terms of its agreements with its clients.

---

[2] Letter from Senator Patrick Leahy, et al., to Spencer Williams, President and CEO of kaléo (Feb. 8, 2017), https://goo.gl/HJuQEP.

**Express Scripts' Contracts with kaléo**

7.      On October 1, 2014, Express Scripts and kaléo entered into two contracts—the "**PSG Rebate Agreement**" and the "**Medicare Rebate Agreement**" (collectively, "**Rebate Agreements**")—each of which provides that kaléo will pay Express Scripts (1) various rebates when its clients' members utilize prescriptions for Evzio and (2) certain administrative fees for administrative services that Express Scripts provides, ███████████████████████████████████████.

8.      One of the rebates owed under the Rebate Agreements is a "**price protection rebate**," ████████████████████████████████████████████████████████. A simplified illustration of how this works is reflected in the following example: ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

9.      ████████████████████████████████████████████████████

████████████████████████████████████ At first, kaléo complied with its contractual duties to rebate Express Scripts. Indeed, kaléo acknowledged its contractual obligations by paying, without objection, all of the rebates—including price protection rebates—and all of the administrative fees that were due to Express Scripts under the Rebate Agreements, from October 2014 through March 2016.

**Kaléo Refuses To Pay Price Protection Rebates in Breach of Its Contractual Obligations**

10.     Once the price protection rebates that kaléo owed to Express Scripts swelled because of kaléo's massive price increases, kaléo began to repudiate its contractual obligations.

4

For April 2016, Express Scripts invoiced kaléo for price protection rebates in excess of $4.9 million, and for May 2016 it invoiced kaléo for price protection rebates in excess of $2.2 million. When kaléo received the invoices for these months, it paid only portions of the invoices rather than the full amount due, which was a material breach of each Rebate Agreement. And from June 2016 to the present, kaléo compounded its material breaches by refusing to pay *any* of the amounts Express Scripts invoiced it for—neither rebates nor administrative fees. Instead, kaléo has wrongfully sought to reap hefty profits from sales of Evzio at outlandish prices and to enjoy the fruits of Express Scripts' administrative services without remitting to Express Scripts the rebates and administrative fees it promised to pay under the Rebate Agreements.

11. All told, for April 2016–January 2017, kaléo has failed to pay Express Scripts more than $14.5 million in rebates and administrative fees, of which over $14 million consists of unpaid price protection rebates. Express Scripts has repeatedly demanded payment for the unpaid invoices, and kaléo has repeatedly refused to pay. The amount kaléo owes to Express Scripts continues to increase as additional rebates and fees become due each month.

12. To rectify kaléo's material breaches of the Rebate Agreements, Express Scripts respectfully seeks a damages award to compensate it for the unpaid rebates and administrative fees owed under the Rebate Agreements.

**Parties**

13. Express Scripts, Inc., is a corporation organized under the laws of Delaware. Its principal place of business is in St. Louis, Missouri.

14. Express Scripts Senior Care Holdings, Inc., is a corporation organized under the laws of Delaware. Its principal place of business is in St. Louis, Missouri. Express Scripts Senior Care Holdings, Inc., is a wholly-owned subsidiary of Express Scripts, Inc.

15. kaléo, Inc., is a corporation organized under the laws of Virginia. Its principal place of business is in Richmond, Virginia.

## Jurisdiction and Venue

16. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $75,000, and there is complete diversity among the parties.

17. This Court has personal jurisdiction over kaléo under the forum-selection clauses in the two Rebate Agreements, each of which provides that "Any action . . . brought under this Agreement, shall be brought in Missouri." PSG Rebate Agreement § X(L); Medicare Rebate Agreement § XI(K). In addition, this Court has personal jurisdiction under Missouri's long-arm statute, Mo. Rev. Stat. § 506.500, because kaléo transacts business with Express Scripts in Missouri pursuant to the Rebate Agreements.

18. Venue in this Court is proper under 28 U.S.C. § 1391(b) and under the forum-selection clauses cited in the previous paragraph.

## Factual Background

**Pharmacy Benefit Managers**

19. Express Scripts is a pharmacy benefit manager ("**PBM**"). As a PBM, Express Scripts manages prescription drug benefits pursuant to contracts with its clients, which include managed care organizations, health insurers, employers, and unions.

20. Express Scripts also negotiates with pharmaceutical manufacturers for rebates—*i.e.*, retrospective discounts. Although pharmaceutical manufacturers unilaterally set the price of their products, rebates—particularly price protection rebates—can help ensure that prices remain stable and predictable for Express Scripts' clients.

21. Express Scripts shares rebates with its clients according to the terms of its contracts with its clients. A price protection rebate that prevents price gouging thus benefits

Express Scripts' clients and their millions of members and beneficiaries who ultimately pay less for their prescription medications, in spite of drug manufacturers that unreasonably raise the prices of their drugs.

**Drug Formularies**

22. Health plans usually do not provide coverage for every prescription drug available in the market. Instead, they often develop a clinically sound list of covered drugs, called a "**formulary**," and provide varying degrees of coverage for drugs on the formulary.

23. When multiple drugs compete with each other, a formulary may prefer certain of those drugs over the others and provide that the favored drugs (known as "**preferred**" products) have a lower co-pay or coinsurance than the non-favored drugs (known as "**non-preferred**" products). Health plans may further distinguish between **non-preferred** drugs by placing extra restrictions on their usage, such as requiring step edits or prior authorizations. A non-preferred drug with these restrictions is known as "**non-preferred (restricted)**," and a non-preferred drug without these restrictions is known as "**non-preferred (unrestricted)**."

24. Health plans decide for themselves what drugs to include on their own formularies and what level of preference to assign them.

25. Express Scripts has decades of expertise developing formularies. Each year it publishes its National Preferred Formulary, which it develops using a rigorous four-step process that takes into consideration numerous factors, including the drug's efficacy, safety, available alternatives, and cost. Clinical appropriateness is the foremost consideration; any drug formally recommended for inclusion on the National Preferred Formulary by a committee of independent practicing clinicians will be added to the Formulary, regardless of its cost. Only if the

independent committee deems it "optional" to include the drug will cost considerations affect the drug's placement on the Formulary.[3]

26. In conjunction with the development of its National Preferred Formulary, Express Scripts annually prepares an "**exclusion list**," which is a list of drugs expressly excluded from the National Preferred Formulary because clinically equivalent alternatives are available at a significant cost savings.[4]

27. Express Scripts' clients may choose to adopt its National Preferred Formulary and exclusion list in whole or in part. As a consequence, placement on the National Preferred Formulary tends to boost a drug's utilization, and placement on the exclusion list tends to shrink it. Drug manufacturers like kaléo are thus eager for their drugs to appear on the National Preferred Formulary and avoid the exclusion list.

28. Many of Express Scripts' clients develop and maintain their own customized formularies, which may or may not match Express Scripts' National Preferred Formulary and exclusion list.

**The Rebate Agreements**

29. In 2014, Express Scripts, Inc., and kaléo entered into the PSG Rebate Agreement (the full title is the "Preferred Savings Grid Rebate Program Agreement"), which is attached as **Exhibit 1**. The following year, the parties entered into the First Amendment to the PSG Rebate Agreement ("**First Amendment**"), which is attached as **Exhibit 2**.

---

[3] *See* Express Scripts, *White Paper: Formulary Development at Express Scripts* (Oct. 2016), https://goo.gl/bOk78w.

[4] *See* Express Scripts, *Our 2017 National Preferred Formulary* (Aug. 1, 2016), https://goo.gl/rZur2O; Express Scripts, *Our 2016 National Preferred Formulary* (July 31, 2015), https://goo.gl/u5tLUh.

30.     Also in 2014, Express Scripts Senior Care Holdings, Inc., and kaléo entered into the Medicare Rebate Agreement (the full title is the "Medicare Part D Rebate Program Agreement"), which is attached as **Exhibit 3**.

31.     Each of the Rebate Agreements became effective October 1, 2014, and each remains in effect until a party opts to terminate it. On March 15, 2017, kaléo sent Express Scripts a Notice of Termination in which it advised Express Scripts that it intends to terminate the PSG Rebate Agreement effective December 31, 2017. Neither party has exercised its right to terminate the Medicare Rebate Agreement, which remains in effect without any current end date.

32.     The PSG Rebate Agreement and the Medicare Rebate Agreement apply to different types of health plans. The Medicare Rebate Agreement governs utilization of Evzio by individuals on certain Medicare Part D plans, whereas the PSG Rebate Agreement governs utilization of Evzio by individuals on other health plans. Some of the provisions of the Rebate Agreements are similar, so this Complaint addresses the two in tandem, except where expressly noted.

33.     The heart of the Rebate Agreements is ▬▬▬▬▬▬▬▬▬, in which kaléo agreed to provide rebates to Express Scripts when Evzio is utilized (*i.e.*, when a member of a health plan that is a client of Express Scripts fills a prescription for Evzio), if certain criteria are met. The Rebate Agreements provide for two types of rebates, which are described below in paragraphs 37–49.

34.     In ▬▬▬▬▬ of the Rebate Agreements, kaléo agreed to pay Express Scripts administrative fees of ▬▬▬▬▬▬▬▬▬▬ in exchange for certain administrative services, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.

9

35. In ▮▮▮▮ of the Rebate Agreements, Express Scripts agreed to send kaléo monthly invoices for the rebates and administrative fees, and kaléo agreed to pay those invoices ▮▮▮▮.

36. In ▮▮▮▮ of the Rebate Agreements, the parties agreed that the Agreements would commence on ▮▮▮▮ and would remain in effect until terminated by the parties. ▮▮▮▮ also specifies the conditions under which a party can terminate the Agreements.

**The Formulary Rebate and the Price Protection Rebate**

37. The Rebate Agreements provide for two types of rebates: formulary rebates and price protection rebates.

38. A formulary rebate is ▮▮▮▮.

39. A price protection rebate is ▮▮▮▮.

40. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████.

41. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████.

42. ████████████████████████████████████████
████████████████████████████████████
██████:

| ██████ | ██████████████████ | | | | | | |
|---|---|---|---|---|---|---|---|
| ██████████ | ████ | ██ | ████ | ██ | ████ | ████ | ████ |
| █ | ████ | ██ | ████ | █ | ████ | ████ | ████ |
| █ | ████ | ██ | ████ | █ | ████ | ████ | ████ |
| █ | ████ | ██ | ████ | █ | ████ | ████ | ████ |
| █ | ██ | ██ | ██████ | █ | ████ | ████ | ████ |
| █ | ██ | ██ | ████ | █ | ████ | ████ | ████ |



43. █████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
█████████████████████████████████.

44. █████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████

45. █████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████.

46. █████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████.

47. █████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████████████████:

| ███████ | ███████ | ████████ | ███████ |
|---------|---------|----------|---------|
| ███████ | ███████ | ███ | ████████ |
| ████████ | ███████ | ███ | ████████ |
| ████████ | ███ | ███ | ███ |

48. kaléo fully understood and agreed that it would pay these various amounts ████████████████████████████████.

49. kaléo's agreement to pay price protection rebates ████████████████ ████████████ is a fundamental term of the Rebate Agreements. Without price protection ██████████████████████████████, Express Scripts' clients would have been exposed to the risk of price shocks—a risk that materialized here after kaléo raised the price of Evzio.

13

**kaléo Increases the Price of Evzio**

50.　As of September 30, 2014, the wholesale acquisition cost ("**WAC**") for Evzio was $718.75 per unit.[5]

51.　On or about November 23, 2015, kaléo increased the WAC for Evzio from $718.75 to $937.50.

52.　On or about February 1, 2016, kaléo *quintupled* the WAC for Evzio, raising it from $937.50 to $4687.50.

**Kaléo's Startling Price Increases Trigger the Price Protection Rebates and Result in Evzio's Exclusion from Express Scripts' National Preferred Formulary**

53.　These substantial price hikes ■■■■■■■■■■■■■■■■■■■■■■■■■■■. As a consequence, kaléo began to owe Express Scripts significant price protection rebates, especially in 2016, after kaléo quintupled the price of Evzio.

54.　A further consequence of kaléo's significant price increases is that Express Scripts placed Evzio on its exclusion list for its National Preferred Formulary, effective July 1, 2016. In announcing this decision, Express Scripts noted that clinically equivalent alternatives, such as the Narcan nasal spray and naloxone syringes, are available for a fraction of the cost of Evzio.

**For Over a Year, kaléo Acknowledged and Satisfied Its Contractual Obligation to Pay Rebates and Administrative Fees**

55.　From October 2014 through March 2016, Express Scripts invoiced kaléo every month for formulary rebates, price protection rebates, and administrative fees owed under the Rebate Agreements for preferred and non-preferred (unrestricted) utilizations of Evzio. For each

---

[5]　A unit of Evzio is 1 milliliter. Evzio is traditionally sold in a two-pack, with each auto-injector containing 0.4 milliliters, for a total of 0.8 milliliters (*i.e.*, 80% of the volume of a unit). Thus, in 2014, the WAC per unit of Evzio was $718.75, while the price of a two-pack was $575 (*i.e.*, 80% of the price of a unit).

14

of these months, kaléo paid the invoiced amounts in full without objection, as required under the Rebate Agreements.

56. For example, for January 2016, Express Scripts invoiced kaléo $32,265.66 under the PSG Rebate Agreement ($1,612.50 for formulary rebates; $5,689.26 for price protection rebates; and $24,963.90 for administrative fees) and $8,286.27 under the Medicare Rebate Agreement ($450.00 for formulary rebates; $5,184.14 for price protection rebates; and $2,652.13 for administrative fees), and kaléo paid these amounts in full without any objection.

57. By paying all of these rebates and administrative fees for over a year, kaléo thus conceded that the Rebate Agreements require it to pay formulary rebates, price protection rebates, and administrative fees to Express Scripts ████████████████████████ ████████████████████.

**kaléo Wrongly Stops Paying the Full Amounts Owed Under the Rebate Agreements**

58. Just as the price protection rebates it owed began to increase substantially due to kaléo's quintupling of the price of Evzio, kaléo failed to pay the full invoiced amount under the PSG Rebate Agreement.

59. For April 2016, Express Scripts invoiced kaléo $5,088,566.19 under the PSG Rebate Agreement for April 2016 ($7,125 for formulary rebates; $4,951,923.90 for price protection rebates; and $129,517.29 for administrative fees), yet kaléo paid only $4,900,095.56 ($7,125 for formulary rebates; $4,767,390.71 for price protection rebates; and $125,579.85 for administrative fees)—a shortfall of $188,470.63.

60. And for May 2016, Express Scripts invoiced kaléo $2,413,192.02 under the PSG Rebate Agreement ($9,937.50 for formulary rebates, $2,266,092.01 for price protection rebates; and $137,162.51 for administrative fees), yet kaléo paid only $147,212.32 ($9,937.50 for

formulary rebates, $128,579.64 for price protection rebates, and $8,695.18 for administrative fees)—a shortfall of $2,265,979.90.

**kaléo Wrongly Stops Paying Any Amounts Owed Under the Rebate Agreements**

61. Starting with the invoices for June 2016, kaléo has failed to pay *any* invoices under either the PSG Rebate Agreement or the Medicare Rebate Agreement, despite its clear obligation to do so.

62. For example, for December 2016, Express Scripts invoiced kaléo $1,038,581.37 under the PSG Rebate Agreement ($4,312.50 for formulary rebates; $977,873.22 for price protection rebates; and $56,395.65 for administrative fees) and $235,062.36 under the Medicare Rebate Agreement ($3,375 for formulary rebates; $219,218.80 for price protection rebates; and $12,468.56 for administrative fees), yet kaléo has failed to pay any of these amounts.

63. All told, for April 2016–January 2017, kaléo has failed to pay Express Scripts over $14.5 million in rebates and administrative fees that it was invoiced under the Rebate Agreements. The Rebate Agreements remain in effect, and Express Scripts continues to invoice kaléo each month for new rebates and administrative fees as they become due, yet kaléo refuses to pay, so the unpaid amount kaléo owes to Express Scripts continues to increase.

64. The bulk of the unpaid amount—over $14 million—consists of price protection rebates owed under the Rebate Agreements due to kaléo's increases of the price of Evzio, but which kaléo wrongfully refuses to pay to Express Scripts.

65. The price protection rebates impose a contractual constraint on kaléo's ability to profiteer off the opioid crisis. kaléo evidently decided to make outsized profits off those who rely on Evzio, so when it began owing substantial price protection rebates in mid-2016, it simply

ceased paying, shirking its contractual obligations so that it could reap excessive profits by gouging Express Scripts and its clients.

**kaléo Continues To Reap Benefits of the Rebate Agreements**

66. Even as kaléo has ceased performing its obligations under the Rebate Agreements, Express Scripts has continued to fulfill all of its obligations, including by providing the administrative services specified by the Rebate Agreements.

67. ███████████████████████████████████████████

███████████████████████████████████████████

███████████████. To date, kaléo and its agents have ███████████████

███, even though it refuses to pay Express Scripts the requisite administrative fees or otherwise perform its obligations under the Rebate Agreement.

**Express Scripts Unsuccessfully Attempts To Resolve This Dispute**

68. On September 28, 2016, Express Scripts sent kaléo a letter demanding full payment of all amounts due under the PSG Rebate Agreement.

69. Over the following months, Express Scripts negotiated with kaléo unsuccessfully in an effort to resolve this dispute amicably and without legal action.

70. On or around December 14, 2016, Express Scripts sent kaléo another letter demanding full payment of all amounts due under both the PSG Rebate Agreement and the Medicare Rebate Agreement.

71. To date, kaléo has steadfastly refused to pay the amounts owed under the Rebate Agreements, despite its contractual obligation to do so.

**Count I – Breach of Contract**
**(PSG Rebate Agreement)**

72. Express Scripts incorporates the allegations in the preceding paragraphs.

17

73. The PSG Rebate Agreement is a binding contract between Express Scripts, Inc., and kaléo.

74. Express Scripts has performed all of its obligations under the PSG Rebate Agreement in full, including by providing the agreed-upon administrative services to kaléo.

75. The PSG Rebate Agreement obligates kaléo to pay Express Scripts certain rebates and administrative fees ███████████████████████████████████.

76. For over a year, Express Scripts invoiced kaléo for the agreed-upon rebates and administrative fees under the PSG Rebate Agreement, and kaléo paid the invoices in full, thereby acknowledging its obligation to pay these rebates and administrative fees.

77. For the April and May 2016 invoices, however, kaléo paid only some of the amounts invoiced under the PSG Rebate Agreement, and starting with the June 2016 invoice kaléo has not paid any of the amounts invoiced.

78. kaléo's failure to pay these invoices is a material breach of the PSG Rebate Agreement.

79. For April 2016–January 2017, the unpaid rebates and administrative fees owed under the PSG Rebate Agreement exceed $13 million.

80. The invoiced amounts that kaléo has not paid continue to increase. The PSG Rebate Agreement remains in effect through the end of 2017, and Express Scripts continues to perform its contractual obligations in full, and to invoice kaléo for corresponding rebates and administrative fees as they accrue, yet kaléo continues to not pay the invoices.

81. Accordingly, kaléo has materially breached the PSG Rebate Agreement and owes Express Scripts damages in excess of $13 million for unpaid rebates and administrative fees for

April 2016–January 2017, plus an additional amount to be determined for unpaid rebates and administrative fees that have accrued since then.

### Count II – Breach of Contract
### (Medicare Rebate Agreement)

82. Express Scripts incorporates the allegations in the preceding paragraphs.

83. The Medicare Rebate Agreement is a binding contract between Express Scripts Senior Care Holdings, Inc., and kaléo.

84. Express Scripts has performed all of its obligations under the Medicare Rebate Agreement in full, including by providing the agreed-upon administrative services to kaléo.

85. The Medicare Rebate Agreement obligates kaléo to pay Express Scripts certain rebates and administrative fees ██████████████████████████████.

86. For over a year, Express Scripts invoiced kaléo for the agreed-upon rebates and administrative fees under the Medicare Rebate Agreement, and kaléo paid the invoices in full, thereby acknowledging its obligation to pay these rebates and administrative fees.

87. Starting with the invoice for June 2016, however, kaléo has not paid any of the amounts invoiced under the Medicare Rebate Agreement.

88. kaléo's failure to pay these invoices is a material breach of the Medicare Rebate Agreement.

89. For June 2016–January 2017, the unpaid rebates and administrative fees owed under the Medicare Rebate Agreement exceed $1.5 million.

90. The invoiced amounts that kaléo has not paid continue to increase. The Medicare Rebate Agreement remains in effect, and Express Scripts continues to perform its contractual obligations in full, and to invoice kaléo for corresponding rebates and administrative fees as they accrue, yet kaléo continues to not pay the invoices.

91. Accordingly, kaléo has materially breached the Medicare Rebate Agreement and owes Express Scripts damages in excess of $1.5 million for unpaid rebates and administrative fees for June 2016–January 2017, plus an additional amount to be determined for unpaid rebates and administrative fees that have accrued since then.

**Prayer for Relief**

92. Wherefore, Express Scripts requests judgment be entered in its favor as follows:

    A.    An award of money due under the PSG Rebate Agreement in an amount to be determined at trial (but of not less than $13 million);

    B.    An award of money due under the Medicare Rebate Agreement in an amount to be determined at trial (but of not less than $1.5 million);

    C.    An award of prejudgment and postjudgment interest; and

    D.    Such additional or different relief as the Court deems just and proper.

Dated: May 16, 2017

Respectfully submitted,

*/s/ Sarah Hellmann*

| QUINN EMANUEL URQUHART & SULLIVAN LLP | HUSCH BLACKWELL, LLP |
|---|---|
| Michael J. Lyle<br>Jonathan G. Cooper<br>Kyra Simon<br>777 Sixth Street NW, 11th Floor<br>Washington, DC 20001<br>mikelyle@quinnemanuel.com<br>jonathancooper@quinnemanuel.com<br>kyrasimon@quinnemanuel.com<br>(202) 538-8000 – Telephone<br>(202) 538-8100 – Fax | Sarah Hellmann<br>190 Carondelet Plaza, Suite 600<br>St. Louis, MO 63105<br>sarah.hellmann@huschblackwell.com<br>(314) 480-1920 – Telephone<br>(314) 480-1505 – Fax |

*Attorneys for Plaintiff Express Scripts, Inc., and Express Scripts Senior Care Holdings, Inc.*